# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **CRYSTAL TONES, LLC,** | |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| vs. | Case No. 2:25-CV-235-DAK-DBP |
| **PYROMATICS CORPORATION, BENJAMIN D'AMICO, HEATHER D'AMICO, PUREFECT BALANCE META_PHARMA LLC, and DIVINE BOWLS, LLC,** | Judge Dale A. Kimball |
| | Magistrate Judge Dustin B. Pead |
| Defendants. | |

This matter is before the court on Plaintiff Crystal Tones, LLC's Motion for Preliminary Injunction [ECF No. 42], and Defendants Benjamin D'Amico, Heather D'Amico, and Purefect Balance Meta-Pharma LLC's (collectively "California Defendants") Motion to Dismiss Amended Complaint [ECF No. 51]. On October 23, 2025, the court held a hearing on the motions. At the hearing, Kennedy D. Nate and Austin C. Nate represented Plaintiff Crystal Tones, Walter A. Romney and Katherine E. Pepin represented Defendants Pyromatics Corporation and Divine Bowls LLC, and Mark A. Nickel and Sara E. Pendleton represented the California Defendants . The court took the motion under advisement. After carefully considering the parties' memoranda and arguments, as well as the facts and law relevant to the pending motion, the court issues the following Memorandum Decision and Order on the pending motion.

# BACKGROUND[1]

Crystal Tones is engaged in the business of distributing and selling vessels and singing bowls that incorporate or utilize quartz and crystal materials—known as infused or alchemy bowls. It claims that the concept, design, and development of the alchemy crystal singing bowls were the brainchild of William Jones ("Jones") and Paul Utz ("Utz"), who are also Crystal Tones' principals. Starting in the late 1990s, Jones and Utz contacted Pyromatics to discuss the creation of infused crystal singing bowls.

Pyromatics is a manufacturing company that uses now-expired patents to manufacture fused-quartz products. For over fifty years, Pyromatics has developed and manufactured a wide variety of fused quartz products, including aerospace rods and tubing, epitaxial reactor coil covers, semiconductor tanks, solar panel plates, heat treating trays, and quartz crucibles. Pyromatics obtained many patents related to the design and manufacture of its fused quartz products and specialized quartz materials, but it has voluntarily allowed these patents to expire because it has developed proprietary and confidential trade secrets that it wanted to protect and not disclose in patent applications. Around 1994, Pyromatics began selling its quartz crucibles to several customers that were then marketed and sold as crystal signing bowls.

Before being contacted by Jones and Utz, Pyromatics primarily manufactured quartz-based products for use in applications involving semiconductors, fiber optics, pharmaceuticals, petroleum, biomedical, molten aluminum processing, and quartz crucible productions for other

---

1    The court notes that the findings of fact and conclusions of law made by a court in deciding a preliminary injunction motion are not binding at the trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 649 (10th Cir. 1992), *overruled on other grounds, Systemcare, Inc. v. Wang Labs Corp.,* 117 F.3d 1137 (10th Cir. 1997) (recognizing that "the district court is not bound by its prior factual findings determined in a preliminary injunction hearing.").

applications such as solar panels. Although Pyromatics had sold the raw crucibles (either in transparent or clouded form) as singing bowls, it had not undertaken any efforts to infuse the bowls with other elements. Crystal Tones had been purchasing the singing bowls from Pyromatics. Crystal Tones, through Jones and Utz, shared with Pyromatics its idea of the alchemy crystal singing bowls infused with gemstones or metals for certain "energies." While Crystal Tones came up with the idea and vision, Pyromatics came up with the process of how to manufacture the bowls.

Pyromatics, who manufactures the bowls, claims that there is no difference between the quartz crucibles and the clear and opaque crystal singing bowls that Pyromatics has been manufacturing since 1975. Pyromatics alleges that prior to selling products to Crystal Tones, it sold crystal singing bowls to several customers, including Crystal Distributing Co., The Crystal Store, Technical Glass Products, AhhhMuse (formerly known as Treehouse), InnterQuartz, C-Quartz, and Universal Center of Light.

Crystal Tones alleges that although Pyromatics knew and had processes in place relating to the process of molding quartz, it did not have any prior experience or knowledge in the creation of alchemy quartz crystal singing bowls for musical applications. Crystal Tones asserts that it and Pyromatics understood and agreed that the information surrounding crystal singing bowls, their development and manufacturing process, and the material used to infuse each bowl were unique, highly confidential and proprietary. Pyromatics disputes at least part of this allegation because Crystal Tones discloses the material used to infuse each bowl in its marketing of the bowls.

Crystal Tones contends that an alchemy crystal singing bowl differs from a crucible because an alchemy crystal bowl is infused with precious gemstones or metals, which alter the chemical composition of the bowls. Crystal Tones claims that Pyromatics understood and agreed

3

that the information surrounding the alchemy crystal singing bowls, their development and manufacturing process, and the materials used to infuse each bowl were Crystal Tones' intellectual property. Pyromatics disputes any such agreement. Pyromatics views Crystal Tones as one of many of its customers who buys its products.

Crystal Tones' singing bowls are made from 99.995% pure crystal quartz, meaning that they are of the highest quality available. Crystal Tones alleges that the manufacturing process, designs, and materials used to create the bowls, as well as the materials used to alter the appearance, resonance, and tone of the bowls are all highly proprietary and confidential information that is known to only Crystal Tones and Pyromatics. The creation of the alchemy crystal singing bowls relied on the infusion of precious metals or gemstones into the crystal singing bowls (the "Infused Bowls"). Pyromatics disputes that Crystal Tones knows anything about the way it manufactures the bowls and again points out that the infused materials and colors are readily disclosed in the marketing.

Crystal Tones hired Pyromatics to assist in the development of the infused bowl process. The parties dispute whether Pyromatics did it as a "work for hire." Specifically, Crystal Tones worked with Sandy Meadows ("Meadows"), Cindy St. Julian ("St. Julian"), and Pyromatics' lead quartz engineer ("Horst") to develop the procedures to "infuse" crystal bowls with gemstones and precious metals. It is also disputed as to how much direction and guidance Crystal Tones gave Pyromatics in how to manufacture Crystal Tones' vision for the bowls.

Initially, Pyromatics rejected Crystal Tones' infusion concept and considered it outside its business model. Pyromatics told Crystal Tones that infusing quartz with any other material constituted contamination of its products. But Utz and Jones were able to persuade Tia Scott, an operations manager at Pyromatics, to undertake their proposed infusion process. Crystal Tones

4

alleges that Jones and Utz provided direction, oversight, and feedback to Pyromatics at every stage of the infusion process and oversaw the creation of the final products. Pyromatics disputes Crystal Tones' level of involvement in creating the infused bowls. Pyromatics states that its manufacturing process for crystal singing bowls and infused singing bowls is confidential and proprietary and that Pyromatics has not shared its manufacturing processes with Crystal Tones.

Nonetheless, Crystal Tones alleges that it retained all intellectual property associated with the process, designs, and materials used to create the Infused Bowls (the "Infused Bowl Trade Secrets"). Crystal Tones also claims that it developed a confidential and proprietary process to color, beautify, and otherwise finish non-infused bowls for sale. Crystal Tones claims that after developing its trade secrets, Crystal Tones shared them with Pyromatics as part of its ongoing, confidential, and work-for-hire relationship. Crystal Tones claims that the only reason it shared its trade secrets with Pyromatics and agreed to work with Pyromatics was because the parties agreed to keep their work and know-how on the crystal singing bowls confidential. Pyromatics, however, disputes that Crystal Tones developed the manufacturing process of how to make the infused singing bowls. Pyromatics claims that Crystal Tones came up with the idea and Pyromatics came up with how to make the bowls. Pyromatics also disputes that its processes for making the bowls were part of a work-for-hire for Crystal Tones. Pyromatics asserts that it has not shared its proprietary information with Crystal Tones and has been making infused singing bowls for other customers for years.

Starting in or around 2005, Crystal Tones developed and began selling its DIVINE bowl series. The DIVINE bowl series included a series of innovative bowls with unique designs and characteristics. The first bowl was Divine MotherTM, which was developed and launched in or around 2005. After Divine MotherTM, Crystal Tones expanded its product line to include

additional unique bowls with a distinct name that served as a designator of the source or origin along with the term "DIVINE." For example, the DIVINE bowl series started with trademarks for the bowls: DIVINE MOTHER, DIVINE FATHER, DIVINE WILL-I-AM, DIVINE SACRED G, DIVINE KRYON. Since 2005, Crystal Tones has used these Divine Marks in advertising, catalogs, and marketing trade shows. The Divine Marks have been used on Crystal Tones' website since at least 2013.

Crystal Tones alleges that it has also developed and used additional trademarks that incorporate the term "DIVINE" to further strengthen its association with Crystal Tones' brand. These include: DIVINE BLISSFUL TRANSFORMATION ALCHEMY, DIVINE BROTHER ALCHEMY, DIVINE FATHER ALCHEMY, DIVINE WILL-I-AM ALCHEMY, DIVINE SACRED G, DIVINE KRYON ALCHEMY, DIVINE FENG SHUI ALCHEMY, DIVINE GRANDFATHER ALCHEMY, DIVINE GRANDMOTHER ALCHEMY, DIVINE MOTHER ALCHEMY DIVINE SACRED GEOMETRY ALCHEMY, DIVINE SISTER ALCHEMY, DIVINE ST. GERMAIN AURA ALCHEMY, AND DIVINE TWIN VIOLET FLAME KRYON ALCHEMY.

Crystal Tones has used each of the Divine Alchemy Marks on its website, in its catalogs, and through partners at trade shows since at least 2024. Crystal Tones has sold the bowls nationwide. Crystal Tones further alleges that the use of the term Divine in connection with singing bowls is distinctive and there is consumer recognition tying the term divine to Crystal Tones. Since the Marks were first used, Crystal Tones clams that it has spent millions of dollars to promote the Marks and develop an association among consumers between the Marks and Crystal Tones.

Crystal Tones also alleges that it has developed unique designs used on its crystal singing

bowls. These colors and designs are unique to Crystal Tones' bowls and are colors and designs that Crystal Tones developed. Crystal Tones claims it was the first to use the unique color combinations and designs to set its bowls apart and the color and designs are inherently distinctive. Crystal Tones, directly and through its partners, has marketed and sold its Carnelian and Abalone crystal singing bowls using the distinctive trade dress since at least 2014. Crystal Tones has allegedly devoted significant resources to marketing, advertising, and promoting these singing bowls nationwide, which has resulted in significant nationwide sales. As a result of these efforts, the consuming public has come to recognize Crystal Tones' trade dress and to associate it exclusively with Crystal Tones. Crystal Tones, therefore, alleges that it derives invaluable goodwill from this widespread recognition by the consuming public.

Crystal Tones alleges that the popularity of its bowls has grown exponentially over the last 20 years, and the bowls are recognized worldwide as being of the highest quality. Crystal Tones' bowls are highly valuable and, depending on the type of bowl, cost anywhere from $750 to $3,000 per bowl. Crystal Tones claims that its competitors have not been able to match its quality and reputation, primarily due to the confidentiality of its trade secrets. Pyromatics disputes these allegations, arguing that it came up with how to make the bowls and its makes the same bowls for several customers.

In or around July 11, 2012, Benjamin D'Amico began working for Crystal Tones. Ben was a teenager when he met Jones and Utz. He had no experience in the business world and no experience with crystal singing bowls. Jones and Utz state that they taught Ben all aspects of Crystal Tones' business. Ben, however, states that Jones and Utz took advantage of his young age and vulnerability. They coerced him into a romantic relationship and his employment as a teenager at Crystal Tones emerged from the coercive romantic relationship he had with Jones and Utz. Ben

claims that he worked unpaid for Crystal Tones for two years in exchange for Jones and Utz providing Benjamin with food and shelter. Benjamin only began to receive a paycheck when Utz exited the romantic relationship and Jones required Benjamin to start paying for food, household expenses, utilities, and the mortgage. Benjamin alleges that it was far from a mentoring relationship. Jones and Utz were more than twice Ben's age, and Ben claims that they manipulated him and made him perform any job they pleased. Although Benjamin did not have experience in singing crystal bowls, he grew to understand every aspect of the business and became operations manager.

As operations manager under the guidance and leadership of Jones and Utz, Ben came to know virtually all confidential aspects of Crystal Tones' business. Crystal Tones alleges that Ben was introduced to Pyromatics, learned the trade secrets associated with the singing bowls, and was given access to additional confidential information. As operations manager, Ben was responsible for maintaining company files, including confidentiality agreements. Crystal Tones required each of its employees to sign a confidentiality agreement as a condition of employment. Like any other employe Ben was obligated to sign a confidentiality agreement. Initially, Benjamin signed a confidentiality agreement that was kept in his corporate file.

In his role as operations manager, Ben worked closely with Tia Scott and, later in time, was introduced to the principals of Pyromatics, Sandy Meadows and Cindy St. Julian. In or around the start of 2019, Crystal Tones approached Meadows and St. Julian about purchasing Pyromatics. As a result, and to further solidify the confidential nature of their pre-existing relationship, Pyromatics and Crystal Tones entered into a Mutual Agreement of Confidentiality (the "Confidentiality Agreement"). The Confidentiality Agreement confirmed the confidential nature of the relationship between Pyromatics and Crystal Tones and permitted the parties to disclose confidential financial

information to each other. Crystal Tones alleges that it has performed all its duties and obligations under the Confidentiality Agreement. At or around the time the parties signed the Confidentiality Agreement, the parties agreed to maintain the confidentiality of the Trade Secrets. Ben participated in most of the direct communications with Meadows and St. Julian regarding the potential purchase of Pyromatics. Over approximately five years, Crystal Tones and Pyromatics engaged in discussions regarding the sale of Pyromatics to Crystal Tones.

The popularity of Crystal Tones' bowls continued to grow, and Crystal Tones continued to increase the volume of its orders to Pyromatics. Specifically, in or around June 2024, Crystal Tones agreed to a minimum purchase order worth millions of dollars. In exchange, Pyromatics agreed to produce the needed product based on the purchase order. Crystal Tones agreed to pay tens of thousands of dollars per week to Pyromatics to cover the costs of the purchase order. Crystal Tones understands that it is Pyromatics' biggest customer.

As Crystal Tones' operations manager, Ben occasionally traveled to Crystal Tones' partners to audit partners' books and check on the status of operations. Starting in or around 2018, Ben began conducting visits and audits of the Crystal Room, in Mount Shasta, California. At that time, Defendant Heather D'Amico worked as an employee of the Crystal Room. Ben met Heather and began a relationship with her. Ben did not disclose the relationship to Jones, and he continued to live with Jones as his boyfriend and travel with Jones.

In or around May 2021, Ben states that he decided to leave his allegedly coercive relationship with Jones and terminate his employment with Crystal Tones. Ben continued his relationship with Heather. Prior to Ben's last day at Crystal Tones, Jones conducted an audit of the employee files that had been managed by Ben during his time as operations manager. Although all the other employee files contained the standard confidentiality agreement required for

employment with Crystal Tones, Jones could not find the confidentiality agreement Ben had allegedly signed. Jones confronted Ben about the missing confidentiality agreement and Ben agreed to sign a new agreement. Ben states that Jones refused to release his last paycheck unless Ben signed the agreement, and he believes he was coerced into signing it. Crystal Tones and Ben entered into a new Confidentiality and Proprietary Rights Agreement on or around August 7, 2021 (the "Ben NDA"). Ben alleges that the only consideration Crystal Tones offered in exchange for the agreement was payment for services Ben had already performed and for which Crystal Tones was required by law to pay.

Under the terms of the Ben NDA, Ben agreed to keep all of Crystal Tones' trade secret information confidential. The Ben NDA obligated Ben to maintain the confidentiality of all confidential information he obtained from Crystal Tones in perpetuity. The Ben NDA also included restrictive covenants regarding Crystal Tones' suppliers, customers, and an obligation not to compete—directly or indirectly—against Crystal Tones. In the event of a breach of the Ben NDA, Benjamin agreed that Crystal Tones would be "entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security."

Crystal Tones alleges that it has performed all its duties and obligations under the Ben NDA. Although Ben left Crystal Tones' direct employment, he became a Crystal Tones licensed partner. Ben joined his new wife, Heather, in a business called Purefect Balance in or around June 2022. Heather began Purefect Balance in 2016 in Mount Shasta as a California-based retailer of wellness products, including infusion, teas, aromatherapy sprays, jewelry, art, and clothing.

10

Ben states that during his employment with Crystal Tones, he was told two things that were not public. The first thing was that Crystal Tones did not make their own bowls in Utah, despite representations it made to clients and other employees. The second thing was a confidential metal coating process with which Ben states he was never involved and about which he had little to no information. During his employment, Ben was never exposed to any manufacturing processes, design techniques, methods, procedures, ingredient lists, formulas, chemical compositions, supplier lists, or any other sort of instructions or information related to the design and manufacture of the crystal singing bowls by Pyromatics.

On or around September 29, 2023, the California Defendants entered into a Licensed Partner Agreement with Crystal Tones (the "Partner Agreement"). Under the terms of the Partner Agreement, Crystal Tones agreed to disclose confidential information to the California Defendants. (Partner Agreement § 7.) The California Defendants agreed to "keep confidential all Confidential Information that may have come to [their] attention or knowledge and/or been obtained prior to the signing of th[e] [Partner Agreement]." The California Defendants also agreed that Crystal Tones would suffer irreparable harm if its confidential information was disclosed. The Partner Agreement allows Crystal Tones to seek a preliminary injunction "without the requirement that [Crystal Tones] post bond or comparable security unless waiver of a bond is forbidden by Applicable Law."

While the Partner Agreement contains a mandatory arbitration clause, arbitration is not required for disputes "arising out of or related to the Licensed marks, Brand System, Brand Intellectual Property, or Crystal Tones Themed Locations IP, or any breach of the confidentiality provisions of Section 7." The Partner Agreement also permits Crystal Tones to commence litigation or other legal proceedings, without first submitting such claim to arbitration, with respect

to any claims relating to: (i) any claims relating to or arising out of the use or misuse of any of the Licensed Marks, Brand System, Brand Intellectual Property, or Crystal Tones Themed Locations IP; (ii) any threatened or alleged breach of the confidentiality provisions of Section 7; or (iii) enforcement of the dispute resolution provisions of this Agreement.

Section 2(B)(5) of the Partner Agreement also states that during its term, the California Defendants could "not enter into any agreement with any person or entity for the sale, license or development of competing singing bowls, accessory items or other non-proprietary products. . ." Crystal Tones alleges that it has performed all its duties and obligations under the Partner Agreement.

In January 2025, despite being engaged in ongoing discussions regarding Crystal Tones' purchase of Pyromatics, Crystal Tones alleges that Pyromatics abruptly terminated the acquisition discussions and informed Crystal Tones it was no longer interested in discussing an acquisition by Crystal Tones. Crystal Tones was surprised by the sudden termination of discussions because, among other things, both parties had spent significant time and resources exploring an acquisition. During these negotiations, Pyromatics never disclosed to Crystal Tones that it was working with Crystal Tones' former employee (Ben) and his current partner (Heather) at Purefect Balance to create a company that would directly compete with Crystal Tones. However, Crystal Tones continued to send its weekly payments to Pyromatics and order new product. Despite these payments, in or around early March 2025, Pyromatics informed Crystal Tones that it would stop shipping product until Crystal Tones paid down some amounts owing for past purchases. Crystal Tones was again surprised by Pyromatics' statement because the parties had agreed to weekly payments in exchange for Pyromatics' production and shipping of singing bowls. Pyromatics asked Crystal Tones to hold its production orders so Pyromatics could make

something Pyromatics described as "trays" for another client, and, in the spirit of cooperation, Crystal Tones agreed to do so.

Unbeknownst to Crystal Tones, Pyromatics had been working with Ben and Heather since November 2022 to set up a new company to compete with Crystal Tones. Pyromatics had additional conversations with Ben and Heather about setting up a competing company on December 3, 2024, and January 16 and 27, 2025. In pursuit of their new venture, and unbeknownst to Crystal Tones, on or around January 16, 2025—and at the precise time that Pyromatics discontinued acquisition discussions and was actively collaborating with Benjamin and Heather—a website titled www.divinebowls.love was registered.

On February 3, 2025, Divine Bowls filed its articles of organization with the State of Ohio. On or around March 1, 2025, Divine Bowls created an Instagram account and included its first post. The reference to 1975 and Divine Bowls' purported experience with quartz-crystal technology is virtually the same as Pyromatics' description on its website. The www.divinebowls.love website also specifically states that it is marketing and selling infused bowls. On March 2, 2025, Divine Bowls included another post on its Instagram page, including images of Crystal Tones' bowls that were developed using the Trade Secrets. Divine Bowls also updated its website to include images of Crystal Tones' bowls, including bowls that were created using Crystal Tones' purported trade secrets. On March 5, 2025, Divine Bowls hosted an event at the Oscars to try to market and sell crystal singing bowls. The Instagram post also contains various images of Ben and Heather selling Crystal Tones' singing bowls under the Divine Bowls name.

Crystal Tones was unaware of Divine Bowls or Defendants' efforts and collaboration to use its alleged trade secrets until approximately March 11, 2025. On March 11, 2025, Crystal Tones received an email from Tia Scott, Pyromatics' operations manager. Scott informed Crystal

Tones that Pyromatics was having issues with FedEx and asked Crystal Tones to investigate the shipping issues. Crystal Tones contacted its FedEx representative, who provided a CSV file for review. Crystal Tones audited the shipping information and determined that Pyromatics had been using Crystal Tones' FedEx shipping account. Although Pyromatics had not billed Crystal Tones for a specific shipment, Crystal Tones was surprised to see Ben's name in the tracking logs. The FedEx CSV file disclosed a tracking number showing a product being shipped to Ben from Pyromatics at around the same time Pyromatics started to refuse shipping product to Crystal Tones.

Crystal Tones used the tracking number (8684385463) in the FedEx CSV file to search FedEx's website and discovered that Pyromatics had sent a shipment weighing 636 pounds to Ben. It appears that Ben signed for the package on February 20, 2025. The shipment weight of 636 pounds would typically equate to approximately $60,000 worth of Crystal Tones' products. Crystal Tones spoke to Scott at Pyromatics and asked why the product was shipped to Ben. But Scott denied that Pyromatics had shipped products to Ben. Crystal Tones immediately began investigating and discovered Divine Bowls' Instagram page and website. Although Crystal Tones suspected there was a connection between Pyromatics and the California Defendants it continued to investigate.

On March 13, 2025, Purefect Balance posted on its Facebook page that it had launched its own crystal singing bowl line. On March 16, 2025, Crystal Tones confirmed the connection between the Defendants because Defendants posted on their Instagram page, acknowledging the "two companies coming together." Crystal Tones also discovered that Purefect Balance's website referred directly to Divine Bowls. On or around March 19, 2025, Ben posted about Divine Bowls on LinkedIn, admitting that "Divine Bowls and Purefect Balance unveiled their collaboration to

14

the world" at the Academy Awards. Ben also stated that that each of Divine Bowls' products "is infused with Purefect Balance's natural products, herbs, oils etc.," that crystal singing bowls are available for "Natural Product Brands interested in custom bowl infusions featuring their elements," and that Divine Bowls was "offering limited opportunities for custom infusions." Crystal Tones alleges that each of the bowls Defendants are selling online are Crystal Tones' bowls, which Defendants developed using Crystal Tones' purported trade secrets.

On March 24, 2025, Crystal Tones contacted Pyromatics to discuss its concerns and to ask Pyromatics about its intentions with Divine Bowls. Pyromatics allegedly refused to answer any questions because it was "none of [Crystal Tones'] business." Crystal Tones asserts that it has never consented to Pyromatics and the California Defendants using Crystal Tones' trade secrets to create competing singing bowls or to pass off infused singing bowls as their own. Crystal Tones has also not consented to Pyromatics and the California Defendants disclosing or using the alleged trade secrets to Divine Bowls.

Crystal Tones claims that starting on or around March 2, 2025, Defendants began using the infringing mark Divine Bowls (the "Infringing Mark") in commerce and that Defendants use of www.divinebowls.love amounts to cybersquatting. Around the same time, Defendants started using allegedly infringing trade dress that is remarkably similar in shape, color, and content to Crystal Tones' products (the "Infringing Trade Dress"). Crystal Tones has not authorized Defendants Pyromatics, Divine Bowls, Heather, or Benjamin to use Crystal Tones' marks or trade dress. Crystal Tones claims that it is the senior user of the marks and trade dress because it has used the marks for more than 20 years before Defendants launched Divine Bowls and that it used and marketed the trade dress nationwide for years before Defendants' allegedly infringing use.

As a result of Crystal Tones' nationwide advertising and sale of products using the marks

and the trade dress, Crystal Tones claims it has obtained nationwide priority and common law rights in the marks. Defendants' use of an allegedly infringing mark to market and sell their products is confusingly similar to Crystal Tones' marks because both use the term "divine" in connection with competing singing crystal bowls.

Crystal Tones argues that Defendants' use of the allegedly infringing trade dress on their products is confusingly similar to Crystal Tones' Trade Dress because they both use identical colors to market and sell singing crystal bowls. Defendants market and sell their products through the same channels of trade as Crystal Tones. Crystal Tones contends that due to the strength of its marks, the similarity in the marks and trade dress, the similarity of the products, and the similarity of the trade channels, Defendants' use of the allegedly infringing mark and trade dress is likely to cause confusion among consumers as to the source, origin, or affiliation of Defendants' products with Crystal Tones.

## DISCUSSION

Two motions are before the court: (1) Plaintiff's Motion for Preliminary Injunction; and (2) the California Defendants' Motion to Dismiss Amended Complaint for lack of personal jurisdiction. Because "personal jurisdiction is a prerequisite to granting injunctive relief," the court must address the California Defendants' motion to dismiss first. *National Union Fire Ins. Co. v. Kozeny*, 115 F. Supp. 2d 1231, 1236 (D. Colo. 2000) (citing *Citizens Concerned for Separation of Church and State v. City and County of Denver*, 628 F. 2d 1289, 1299 (10th Cir. 1980)).

### <u>California Defendants' Moton to Dismiss for Lack of Personal Jurisdiction</u>

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the California Defendants move to dismiss the Amended Complaint for lack of personal jurisdiction over them in Utah. Crystal Tones has the burden of demonstrating that the court has jurisdiction over the

California Defendants. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). To defeat a motion to dismiss, a plaintiff must make a prima facie showing of personal jurisdiction. *Old Republic Ins. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). The court accepts the well-pled allegations of the plaintiff's complaint as true unless the defendant contradicts those allegations in affidavits. *Kennedy v. Freeman*, 919 F.2d 126, 128 (10th Cir. 1990). If the parties submit conflicting affidavits, the court resolves any factual disputes in the plaintiff's favor. *Id.*

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Utah's long-arm statute extends jurisdiction to the fullest extent allowed by the Due Process Clause of the Fourteenth Amendment and is, therefore, coextensive with the due process analysis under the United States Constitution. Utah Code Ann. § 78B-3-201(3). Under the due process clause, a court may exercise jurisdiction over a defendant if (1) the defendant purposefully established "minimum contacts" with the forum, and (2) the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Old Republic*, 877 F.3d at 903.

A defendant's contacts may subject it to either general or specific jurisdiction in a forum. *Id.* A defendant is subject to general jurisdiction in a forum when its contacts "are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler*, 571 U.S. at 122. Crystal Tones is not attempting to establish general jurisdiction over any of the California Defendants. Accordingly, the court will only consider whether this forum has specific jurisdiction over the California Defendants. Specific jurisdiction is case-specific. *Old Republic*, 877 F.3d at 904. Courts in the Tenth Circuit conduct a three-part analysis when considering specific jurisdiction: (1) whether the defendant purposefully directed his/her/its activities at residents of the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether exercise

17

of jurisdiction would be unreasonable. *Id.*

The purposeful direction test ensures that an out-of-state defendant "'will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person.'" *Id.* at 904-05 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). An out-of-state defendant's activities can satisfy the purposeful direction requirement under at least three frameworks: "(1) continuing relationships with forum state residents ('continuing relationships'); (2) deliberate exploitation of the forum state market ('market exploitations'); and (3) harmful effects in the forum state ('harmful effects')." *Id.* at 905.

"The 'continuing relationships' framework considers an out-of-state defendant's continuing relationships and obligations with citizens of the forum state." *Great Bowery v. Best Little Sites*, 609 F. Supp. 3d 1240, 1247 (D. Utah 2022). "In cases involving contractual contacts between the defendant and forum state residents, the purposeful direction analysis often employs" the "continuing relationships" framework. *Old Republic*, 877 F.3d at 905. Personal jurisdiction can be established "based on parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Great Bowery*, 609 F. Supp. 3d at 1248. "The defendant's solicitations of or direct communications with forum state residents suggest purposeful direction." *Lizard Skins, LLC v. LZRD Tech, Inc.*, No. 2:23-CV-00801-JNP-DAO, 2024 WL 4226929, at *3 (D. Utah Sept. 18, 2024).

The United States Supreme Court addressed the harmful effects method for finding purposeful direction in *Calder v. Jones*, 465 U.S. 783, 790-91 (1984). In *Old Republic,* the Tenth Circuit explained that purposeful direction exists under *Calder* where (1) the defendant commits an intentional act, (2) that is expressly aimed at the forum state, (3) with knowledge that there will

18

be harmful effects in the forum state. 877 F.3d at 907.

The California Defendants argue that they lack the sufficient minimum contacts with Utah to be subject to jurisdiction here and could not have anticipated being haled into court in Utah. The court must address jurisdiction as to each defendant separately.

### A. Heather D'Amico

Crystal Tones' arguments for asserting jurisdiction over Heather are that she is the alter ego of Purefect Balance, she signed the LPA for Purefect Balance, and she came to Utah with Ben and had a dinner with Jones in which they allegedly asked him for a loan. But Heather was not a party to the LPA, her name appears on the LPA only as an owner of Purefect Balance. She is not a signatory to any agreement that purports to confer jurisdiction over her individually. Crystal Tones argues that Heather is the alter ego of Purefect Balance. But Crystal Tones would need to allege improper use of the corporate form, that the business was a mere instrumentality of Heather, and that she engaged in improper conduct in the formation or use of the business entity. Crystal Tones does not allege any facts from which the court could surmise that it was an alter ego situation. Crystal Tones' unsupported assertions that Heather is an alter ego are insufficient for asserting jurisdiction over her in this court. Heather's contact with Utah is so attenuated that Crystal Tones has not brought sufficient factual allegations to show she should be fairly haled into court here. One dinner with Jones in which she may have asked for money on behalf of her company does not establish personal jurisdiction over Heather personally. And, whether the loan, which was not given, had anything to do with Purefect Balance's alleged unfair competition is completely speculative. Because the court concludes that there are insufficient allegations against Heather to support personal jurisdiction in Utah, the court grants the California Defendants' motion to dismiss for lack of personal jurisdiction with respect to Heather.

### B. Purefect Balance

Crystal Tones argues that the court has personal jurisdiction over Purefect Balance because it entered into the LPA with Crystal Tones to become a Crystal Tones licensed partner, Purefect Balance placed four orders with Crystal Tones for products that were shipped from Utah, and Purefect Balance has caused harm to Crystal Tones by unfairly competing against Crystal Tones. In 2023, Purefect Balance entered into the LPA agreement to become a distributor of Crystal Tones' products for a period of three years. The parties, therefore, contemplated an ongoing relationship for three years. But the California Defendants argue that the central purpose of the LPA is to allow a California company to sell Crystal Tones singing bowls in California. After entering the LPA, Purefect Balance placed four product orders with Crystal Tones. Crystal Tones assets that the orders were for products to be prepared and shipped from Utah. But the California Defendants argue that the bowls were made and sent from Pyromatics in Ohio.

The California Defendants also focus on the fact that the invoices for the products were from Crystal Tones employees, billed to California, and shipped to locations in California and Europe. The California Defendants assert that it is insufficient to exercise jurisdiction over a defendant who "entered into, agreed to perform, and has performed all of its obligations pursuant to its contracts outside of Utah." *Patriot Sys., Inc.*, 21 F. Supp. 2d at 1322. More significantly, even if the invoices provide evidence that Purefect Balance purchased products from Crystal Tones on four occasions, the purchase of those products is not related to the claims asserted in this case. Crystal Tones is not seeking to establish general jurisdiction and, even if the purchase orders show continuous contact, such contact would only support jurisdiction over disputes related to those purchases. There is no dispute in this case regarding those four purchases.

Crystal Tones alleges that Purefect Balance marketed competing bowls in California,

conspired with an Ohio company to make competing bowls, and that Crystal Tones felt harm in Utah. The LPA is only a financial agreement. It does not contain non-compete provisions preventing Purefect Balance from contracting directly with Pyromatics. Therefore, the LPA and Purefect Balance's purchases of product pursuant to the LPA do not provide a basis for jurisdiction over Purefect Balance in Utah with respect to Crystal Tones' unfair competition claims. Purefect Balance may have anticipated being haled into a Utah court with respect to the purchase orders, but those purchases have no connection with its separate business dealings with Pyromatics in Ohio. In addition, the LPA does not mandate that the dispute be brought in Utah or that it must submit to jurisdiction in Utah for matters unrelated to its purchases from Crystal Tones.

Crystal Tones asserts that Purefect Balance had an ongoing relationship with Crystal Tones, knew its competing business with Pyromatics would cause Crystal Tones harm in Utah. There are no allegations that Purefect Balance is selling the competing bowls in Utah. Purefect Balance has never conducted business in Utah, never shipped orders to Utah, nor solicited customers in Utah. Purefect Balance is a brick-and-mortar store in California. While Crystal Tones alleges that Purefect Balance is intentionally competing with it and would have knowledge that such competition would be harmful to Crystal Tones, which is located in Utah, there is no allegation that the competition is expressly aimed at Utah.

"[T]he mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995). In *Patriot Systems v. C-Cubed Corp.*, the court recognized that financial injury in Utah and contractual obligations in Utah could not support jurisdiction in a case where a Utah plaintiff

brought an action in Utah for trade secret misappropriation and copyright infringement against a

Virginia software company. 21 F. Supp. 2d 1318, 1320 (D. Utah 1998). The factual allegations

against the California Defendants are similar to those in *Patriot Systems*, Here, Crystal Tones, a

Utah company, is alleging trade secret misappropriation and breach of confidentiality agreements

against California residents. Crystal Tones is also seeking to establish personal jurisdiction based

on harm felt in Utah rather than actions taken in or directed toward Utah. Therefore, the court

concludes that Crystal Tones has not alleged enough to establish jurisdiction over Purefect

Balance in Utah with respect to the types of claims Crystal Tones asserts in this case. Because

there is not a sufficient nexus, the court grants the California Defendants' motion to dismiss for

lack of personal jurisdiction with respect to Purefect Balance.

### C. **Ben D'Amico**

Crystal Tones alleges that Ben is subject to personal jurisdiction in Utah because he

worked with Crystal Tones in Utah for nearly a decade; he signed a Confidentiality and Proprietary

Rights Agreement (the "Ben NDA") with Crystal Tones as he was leaving his employment there;

he travelled to Utah in late December 2024 or early January 2025, had dinner with Jones and asked

him for a loan; and he has maintained contact with Crystal Tones in Utah because his new

company has a LPA with Crystal Tones and has purchased products from Crystal Tones.

As discussed above with Heather, Ben's signature on the LPA as an owner of Purefect

Balance does not relate to his personal contacts and the one visit to Utah in which Ben and Heather

allegedly asked Jones for a loan has no plausible connection to the present dispute. Moreover, as

discussed above with Purefect Balance, the dispute in this case is not related to Purefect Balance's

purchase of products made under the LPA. Purefect Balance's purchases would not be ascribed to

Ben and would not support jurisdiction over Ben in this District. In addition, Ben's employment

with Crystal Tones ended four years ago and this case does not allege that he engaged in unfair competition at that time. Crystal Tones' claims focus on Ben's current actions. Therefore, the question of whether this court has personal jurisdiction over Ben depends on the validity and enforceability of the Ben NDA, and Ben's knowledge of an alleged disclosure of confidential information.

The California Defendants question the validity and enforceability of the Ben NDA. Specifically, they argue (1) that Ben was forced to enter the agreement under duress because Crystal Tones threatened to withhold his final paycheck if he did not sign the agreement, (2) that there is no consideration for the NDA because Crystal Tones could not legally withhold Ben's final paycheck, (3) that Crystal Tones improperly requires all employees to sign NDAs regardless of whether they have learned any confidential information or trade secrets and Ben did not have access to confidential information on the design and process for making infused crystal singing bowls, and (4) the overly broad terms referring to confidential information preclude a finding that the parties had a meeting of the minds when entering into the NDA. Even if the Ben NDA is binding and enforceable, the California Defendants argue that its terms are permissive instead of mandatory and, therefore, it does not confer personal jurisdiction over Ben in this District.

A party may only consent to jurisdiction through a clear and unambiguous forum selection clause if the consent is obtained through "freely negotiated agreements" that are not "unreasonable and unjust." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). Absent such conduct, Utah courts may only exercise specific jurisdiction over a nonresident if the claim asserted is based on the defendant's contacts with the state. *Patriot Sys., Inc. v. C-Cubed Corp.*, 21 F. Supp. 2d 1318, 1321 (D. Utah 1998).

The California Defendants contend that Crystal Tones required Ben to sign the Ben NDA

to receive his final paycheck after he terminated his employment at Crystal Tones, which was pay that he was already lawfully entitled to receive. Under Utah law, an employer must pay an employee within 24 hours of separation, and it is a misdemeanor to violate the statute. Utah Code Ann. §§ 34-28-5(1)(a), -12. "Accordingly, if an employer threatens to withhold unpaid wages from a terminated employee in order to induce assent to a contract, that threat would be improper." *Sheedy v. BSB Props., LC*, No. 2L13-CV-00290-JNP, 2016 WL 6902513, at *3 (D. Utah Mar. 1, 2016). Ben further claims that he was coerced into signing the Ben NDA because he had been subjected to a decade of personal and professional manipulation and coercion by Jones and Utz. Ben claims that he personally witnessed Crystal Tones coerce at least one other young, sexual partner-turned-employee-turned-former employee into signing a meaningless NDA.

The California Defendants also call the validity of the NDA into question by arguing that Crystal Tones requires all employees to sign an NDA regardless of their access to confidential or proprietary information. They claim that the contract language is so overly broad and vague as to make it unclear what information or knowledge was proprietary or confidential. Therefore, this court should not uphold the Ben NDA as valid or enforceable because it did not give Ben notice of what actual information was covered. Ben argues that he did not learn confidential information regarding the design or process of making infused singing bowls while he was working at Crystal Tones because that information would be in-house at Pyromatics, the company that designed and made the bowls for Crystal Tones. Crystal Tones and Pyromatics dispute which company holds the trade secrets and confidential information in connection with the infused singing bowls. While Ben contends that he had now relevant information, Crystal Tones asserts that Ben knew every aspect of the business and was the principal point of contact with Pyromatics in the parties' potential merger negotiations. Based on these conflicting factual allegations, it is unclear whether

24

Ben had confidential information relevant to the present dispute. Because the agreement is vague as to what trade secrets and confidential information it covers, the California Defendants further argue that the NDA cannot be considered to represent a meeting of the minds between the contracting parties.

The court agrees that there are several factual questions regarding the validity and enforceability of the Ben NDA. Before ruling as to whether the Ben NDA confers jurisdiction over Ben in this District, the court concludes that the parties should conduct jurisdictional discovery into whether Crystal Tones improperly threatened to withhold Ben's pay, whether this caused him to enter the Ben NDA under duress, whether Ben had access to confidential information that would relate to Crystal Tones' allegations in this case, and whether the parties had enough of an understanding as to what confidential information Ben had access to for there to be a meeting of the minds between the parties. These factual disputes cannot be resolved on this motion to dismiss. Therefore, the parties should engage in discovery on these underlying factual questions before the court determines whether jurisdiction over Ben in this District is proper.

If the court determines that the Ben NDA is valid and enforceable, the court will then determine whether the forum selection clause in the Ben NDA is mandatory or permissive. Whether a forum selection clause is dispositive as to personal jurisdiction depends on the contract language and whether it is mandatory or permissive. *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997). Ambiguous forum selection clauses are construed against the drafter and considered permissive, which is unenforceable for establishing personal jurisdiction. *Waste Servs. LLC v. Red Oak Sanitation, Inc.*, No. 2:08CV417-DS, 2008 WL 2856459, at *2 (D. Utah July 23, 2008).

Based on the above reasoning, the court grants the California Defendants' motion to

dismiss for lack of personal jurisdiction as to Heather D'Amico and Purefect Balance. The court denies the motion without prejudice as to Benjamin D'Amico because the court finds that jurisdictional discovery is necessary before determining jurisdiction over Benjamin D'Amico.

## Crystal Tones' Motion for Preliminary Injunction

Crystal Tones moves the court for a preliminary injunction, enjoining Defendants from directly or indirectly using, relying on, or disclosing Crystal Tones' trade secrets related to crystal singing bowls, enjoining Defendants from directly or indirectly marketing for sale crystal singing bowls, enjoining Defendants from using the trademark DIVINE BOWLS to market and sell their competing products, enjoining Defendants from using confusingly similar trade dress, and requiring Divine Dowls to remove its social media pages and website displaying Crystal Tones' crystal singing bowls and infringing trade dress.

Under Rule 65 of the Federal Rules of Civil Procedure, a party moving for a preliminary injunction "must establish that four equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). "[T]he primary goal of a preliminary injunction is to preserve the pre-trial status quo." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). But a preliminary injunction may be granted "only when monetary or other traditional legal remedies are inadequate, and 'the right to relief [is] clear and unequivocal.'" *First Western Capital Mngmt Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). It is Crystal Tones' burden to demonstrate that these factors weigh in its favor. *Heideman v. South Salt Lake City*, 348

26

F.3d 1182, 1188-89 (10th Cir. 2003).

### 1.  Likeliness of Success on the Merits

Crystal Tones asserts nine cause actions of action in this case: (1) misappropriation of trade secrets under the DTSA; (2) misappropriation of trade secrets under the UTSA; (3) breach of contract against Benjamin; (4) breach of contract against the PB Parties; (5) breach of contract against Pyromatics; (6) trademark infringement; (7) unfair competition; (8) trade dress infringement; and (9) cybersquatting. However, "[w]here a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits of one of the claims." *DP Creations, LLC v. Reborn Baby Mart*, No. 2:21-CV-00574-JNP, 2021 WL 5926471, at *3 (D. Utah Dec. 15, 2021).

### A.  Misappropriation of Trade Secrets Claims

Crystal Tones brings misappropriation of trade secrets claims under the DTSA and the UTSA. Because "a claim for trade secret misappropriation under the DTSA and UTSA closely resemble each other," courts typically address both claims with the same analysis. *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023); *see John Bean Techs. Corp. v. BGSE Grp., LLC*, 480 F. Supp. 3d 1274, 1302-03 (D. Utah 2020). To succeed on a misappropriation of trade secrets claim under the DTSA a plaintiff must establish "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means." 18 U.S.C. § 1832 *et seq.*; *John Bean*, 480 F. Supp. 3d at 1302. "A DTSA trade secret includes all forms and types of information that (1) derives value from being secret and (2) that the owner took reasonable measures to keep

27

secret." *Id.*

A trade secret is broadly defined as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3); *see also* Utah Code Ann. §13-24-2(4).

"The fact that information can be ultimately discerned by others—whether through independent investigation, accidental discovery, or reverse engineering—does not make it unprotectable." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 973 (8th Cir. 2011). Moreover, a company "may, without losing [its] protection, communicate [its trade secret] to employees involved in its use . . . [or] likewise communicate it to others pledged to secrecy." *USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 651 (Utah 2016). Similarly, when an entity hires a third party to develop a trade secret, the trade secret belongs to the hiring entity. See Melvin F. Jager, 2 Trade Secrets Law § 8:1; *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1524 (D. Colo. 1993); *Inorganic Coatings, Inc. v. Falberg*, No. CIV. A. 94-5479, 1995 WL 57516, at *4 (E.D. Pa. Feb. 10, 1995) ("[W]hen disclosures of a confidential nature are made to an . . . independent contractor hired to facilitate the development of a product or process, all trade secrets created out of that relationship are the exclusive property of the employer.").

In this case, Crystal Tones defines the Infused Bowl Trade Secrets as "all intellectual

28

property associated with the process, designs, and materials used to create the Infused Bowls." Crystal Tones also defines the "Non-Infused Bowl Trade Secrets" as "the process to finish and beautify the Non-Infused Bowls." While neither the UTSA nor the DTSA have a particularity requirement, the trade secret at issue "must be defined in a manner that allows a factfinder to determine if a trade secret exists under the statute." *Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 641-42 (10th Cir. 2022).

The parties dispute whether Crystal Tones has pled the existence of a protectable trade secret because they disagree as to who developed the infused singing bowls. Crystal Tones acknowledges that Pyromatics was making crystal singing bowls before Crystal Tones existed, but Crystal Tones asserts that it came up with the idea of infusing the crystal with other materials to create the infused alchemy signing bowls. Pyromatics, however, claims that it was infusing similar items into other crystal products prior to Crystal Tones' idea. Pyromatics asserts that Crystal Tones has not specifically identified the trade secrets at issue because Crystal Tones has never possessed any specific or detailed information that Pyromatics uses to design and manufacture its crystal singing bowls or infuse crystal singing bowls with gemstones or other coloring, nor has Crystal Tones ever provided any such information to Pyromatics. Crystal Tones appears to acknowledge that Pyromatics manufactures the bowls, the dispute therefore on trade secrets would encompass who owns trade secrets as to the design of the bowls.

In addition, Crystal Tones claims that Pyromatics does not own the trade secrets related to the bowls because it developed the infused singing bowls at Crystal Tone's request, so the bowls are like a work-for-hire where Crystal Tones retained the rights to the trade secrets in them. Pyromatics contends that it developed all the relevant design and manufacturing process for the bowls and Crystal Tones did not pay for it for doing so. Crystal Tones has never paid Pyromatics for

the research and product development efforts Pyromatics has expended to perfect the design and manufacturing process for the crystal singing bowls. Rather, Crystal Tones has only ever paid Pyromatics for the cost of goods sold and Crystal Tones is simply one of many businesses that has purchased crystal singing bowls from Pyromatics. Therefore, it is not clear that the infused singing bowls are a work for hire situation.

Crystal Tones generally identifies the trade secrets but, given the parties' disputes as to which party created the infused singing bowls, these general definitions are not enough for the court to determine what specific manufacturing process or design or formula that Crystal Tones claims is protected as its trade secret.is something Crystal Tones actually owns as a protectable trade secret. There are many ways in which a crystal singing bowl can be designed and manufactured. Crystal Tones cannot be asserting that it has a trade secret in every way.

Even if Crystal Tones was the owner of the protectable trade secrets, there are questions as to whether Crystal Tomes has allowed access to the information by employees, business partners, or third parties without requiring such individuals to execute confidentiality agreements. Trade secret protection is eviscerated if the information is publicly disclosed. Even if Crystal Tones did provide any confidential information or trade secrets to Pyromatics, it did so without requiring Pyromatics to sign any sort of non-disclosure or confidentiality agreement. Here, the sole agreement executed by Pyromatics and Crystal Tones was the Confidentiality Agreement, which is limited to financial information, information that Pyromatics has not disclosed, nor has Crystal Tones alleged any disclosure of financial information. Thus, it did not protect any information related to the design and manufacture of crystal singing bowls, which is what Crystal Tones is now alleging is a trade secret. Moreover, the Confidentiality Agreement was not executed until March 7, 2019, more than 20 years after Crystal Tones began purchasing crystal singing bowls

manufactured by Pyromatics. Therefore, even if Crystal Tones is the rightful owner of the

intellectual property related to the design and manufacture of infused crystal singing bowls, it is

unclear whether that intellectual property is still protectable given that Pyromatics has the

information and there has never been an agreement to protect the information.

Furthermore, the DTSA and the UTSA allow owners of trade secrets to bring a civil action

for misappropriation. But, again, it is unclear whether Crystal Tones is the owner of the alleged

trade secret at issue. Pyromatics may be the owner of the design and manufacturing process it

developed to manufacture crystal singing bowls and infused crystal singing bowls. Pyromatics

claims it has been manufacturing quartz crucibles and infused quartz products—the precursor for

crystal singing bowls—since its inception in 1975. Over the years, Pyromatics has allegedly

expended significant time and resources to develop and perfect the manufacturing process for

quartz crucibles and crystal singing bowls, including infused and colored crystal singing bowls.

And it has been selling quartz crucibles as crystal singing bowls since at least 1994. Therefore, it is

unclear whether Crystal Tones is a customer or purchaser of Pyromatics' crystal singing bowls or

of Pyromatics developed the infused singing bowls at Crystal Tones' direction. The parties

disagree as to whether Crystal Tones owns Pyromatics' manufacturing process for infused crystal

singing bowls because Pyromatics agreed to work for Crystal Tones under a work for hire

arrangement. If it was a work for hire, Crystal Tones does not appear to have documented it as

such. While something could come to light during discovery, there is nothing in the present record

demonstrating that Pyromatics transferred all intellectual property rights to its manufacturing

process to Crystal Tones. Pyromatics claims that Crystal Tones has only paid Pyromatics for the

cost of goods sold.

The court concludes that Crystal Tones has failed to meet its burden of demonstrating that

it is likely to succeed on its misappropriation claims.

### B.   Breach of Contract Claim Against Pyromatics

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Portfolio Recovery Assocs., LLC v. Migliore*, 2013 UT App 255, ¶ 11, 314 P.3d 1069. Utah courts "look to the writing itself to ascertain the parties' intentions, and . . . consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134. If the language is unambiguous, "the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994.

The Confidentiality Agreement between Crystal Tones and Pyromatics refers to and protects financial information, not design and manufacturing processes. There are no allegations or evidence that Pyromatics disclosed any of Crystal Tones' financial information.   Even if the Confidentiality Agreement protects against the disclosure of any and all confidential information, which the language of the Confidentiality Agreement does not appear to do, there is a dispute as to whether Pyromatics obtained or used any confidential information from Crystal Tones. Crystal Tones does not point to specific information related to the design and manufacturing of crystal singing bowls it gave to Pyromatics that is clearly and unequivocally Crystal Tones' confidential information. Crystal Tones claims that it came up with the vision of an infused crystal singing bowl. But there appears to be a dispute between the parties because Pyromatics was already making singing bowls and infusing other items with similar materials. If the Confidentiality Agreement applied to all confidential information, it is unclear what information Crystal Tones

32

claims is confidential.

There also appears to be a disagreement over whether there was an oral agreement for Pyromatics to keep Crystal Tones' information confidential. Crystal Tones and Pyromatics have been doing business together for more than 25 years. During that time, Crystal Tones claims that Pyromatics understood that the Trade Secrets belonged exclusively to Crystal Tones, and Pyromatics agreed to—and did—maintain their confidentiality. Despite more than two decades of performance, Pyromatics abruptly disregarded its agreements with Crystal Tones to launch Divine Bowls. But again, the court has serious questions about the validity and enforceability of such an oral contract, about what information is confidential, about what information each party has rights to, and about what information has been improperly disclosed to a third party. Therefore, the court finds that Crystal Tones has not demonstrated a likelihood of success on the merits of this breach of contract claim.

## C.  Trademark Infringement/Unfair Competition Claims

Crystal Tones seeks to prevent Pyromatics and Divine Bowls from using the word "DIVINE" in its company names. "Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together as an action brought under [the Lanham Act]." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008); *see also Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477 (8th Cir.1967) ("Trademark infringement is but part of broader law of unfair competition; and facts supporting suit for infringement and one for unfair competition are substantially identical.").

To succeed on a claim for trademark infringement under the Lanham Act, a plaintiff "must demonstrate (1) it has a protectable mark; (2) [Defendants] used [Crystal Tones'] trademark in

connection with any goods or services; and (3) [Defendants'] use creates a likelihood of confusion." *Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239–40 (D. Utah 2020); *see also Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238 (10th Cir. 2016).[2] "Of these factors, 'the central inquiry' is the likelihood of consumer confusion." *Id.*

The parties dispute whether the term "divine" is a protectable mark. The parties dispute whether Crystal Tones owns a protectable and distinctive trademark in the use of "divine" in connection with singing bowls.    A claim for common law trademark infringement "requires the plaintiff to prove the mark is inherently distinctive or has acquired secondary meaning, and that the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion." *Weber Luke All., LLC v. Studio 1C Inc.*, 233 F. Supp. 3d 1245, 1251 (D. Utah 2017). This is because "[t]he stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 975 (10th Cir. 2002). "The categories of trademarks in ascending order of relative strength are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* Generic marks refer to a general class of goods, such as "cola". *Id.* at 975-76. "A descriptive mark identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Id.* "Suggestive marks suggest rather than describe a characteristic of the product and require the consumer to use imagination and perception to determine the product's nature." *Id.* (internal quotation marks and alterations omitted). Finally, "[a]rbitrary marks use common words, symbols, and pictures that do

---

2 "[I]n order to establish claims for trademark infringement and unfair competition, the Plaintiff must demonstrate (1) protectability; (2) that defendants used the subject mark in commerce; and (3) that the infringing use of the mark is likely to cause confusion, mistake, or deceive consumers as to the affiliation, connection or association of the mark." *Icon Health & Fitness, Inc. v. Med. Prods.*, No. 1:10-CV-00207-DN, 2012 WL 3962737, at *3 (D. Utah Sept. 11, 2012).

not suggest or describe any quality or characteristic of the goods or services." *Id.* "[A]rbitrary (common words applied in unfamiliar ways), and suggestive marks (words that connote, rather than describe, some quality or characteristic of a product or service) are inherently distinctive and thus receive the greatest protection against infringement." *Equitable Nat'l*, 434 F. Supp. 3d at 1240.

Pyromatics provides numerous examples of other companies using the term divine in a company name or the naming of singing bowls. While it is unknown when each company began using the term divine in connection with singing bowls, the word appears to have been used widely in the crystal singing bowl industry. Crystal Tones has not demonstrated it was the first to use "divine" in connection with singing bowls. The term divine does not describe the color, dimension, or ingredient of the crystal singing bowl, but the term is used to describe the characteristics of the crystal singing bowls—the divine nature of the bowls and their spiritual healing properties. Whether the term is descriptive or unique and distinctive can be further pursued in discovery, but at this early stage of the litigation, the court has questions as to whether Crystal Tones could be granted a protectable interest in the term divine in connection with crystal singing bowls.

Crystal Tones has not put forth evidence that its use of the term divine has developed a secondary meaning. Given the number of other companies using the term in relation to crystal singing bowls, there are questions as to whether the term has become so associated with Crystal Tones that that the word identifies Crystal Tones as the source of the bowl. There are also questions as to what steps Crystal Tones has taken to police its alleged common law trademark against all these third parties using the term.

Even if the mark "divine" was protectable as an unregistered mark under the Lanham Act, Crystal Tones is still required to prove a likelihood of confusion to succeed on the merits. Mere

knowledge of Crystal Tones using the term in relation to some products does not demonstrate that Defendants had the intent to derive benefit from Crystal Tones' reputation or goodwill. Allegedly, when Crystal Tones and Pyromatics referenced crystal singing bowls in correspondence and purchase orders, they referred to each bowl as the specific gemstone infuse in each bowl, not the name of the bowl. Crystal Tones acknowledges that it has no evidence of actual confusion. But the parties will need to explore this issue. The bowls are fairly expensive so it is likely that customers would spend some time in making their decision to buy the bowls. These issues of intent and likelihood of confusion are too fact-intensive to decide on the current record. Therefore, the court does not believe that Crystal Tones has met its burden of demonstrating a likelihood of success on the merits with respect to these trademark claims.

### D.  Trade Dress Claim

Similarly, the parties dispute whether Crystal Tones' bowl designs and colors are protectible trade dress. "The trade dress of a product is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques." *Sally Beauty*, 304 F.3d at 977. A plaintiff has a trade dress cause of action under the Lanham Act "against any person whose use of a word, symbol, or device is likely to cause confusion regarding the source or origin of the plaintiff's goods[.]" *Id.* Such protection extends "to a single feature or a combination of features in a trade dress." *Id.* "In order to demonstrate trade dress infringement for product packaging, the plaintiff must demonstrate (1) that its trade dress is inherently distinctive or has become distinctive through secondary meaning; and (2) likelihood of confusion." *Id.* "In addition, the party asserting trade dress infringement bears the burden of demonstrating that the trade dress is not functional." *Id.*

Trade dress is distinctive "if its intrinsic nature serves to identify a particular source" and

36

the trade dress "tells a customer that [it] refer[s] to a brand and immediately signal[s] a brand or a product source." *Sally Beauty*, 304 F.3d at 977. Like trademarks, the distinctiveness of a trade dress "is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum[,]" with trade dress that is suggestive, arbitrary or fanciful being inherently distinctive and entitled to protection. *See id.* at 976-77. Trade dress is arbitrary where the "tone and layout of the colors, the style and size of the lettering, and, most important, the overall appearance of the bottle's labeling, 'were selected from an almost limitless supply of patterns, colors and designs[.]'" *Kodiak Cakes*, 358 F. Supp.3d at 1228.

Pyromatics designs and manufactures singing bowls for several customers. Pyromatics is in a situation where it knows of numerous retailers who sell similar, if not identical crystal singing bowls. Crystal Tones is selling crystal singing bowls that Pyromatics has produced. Pyromatics argues that the de minimis distinctions and differences identified by Crystal Tones, if any, in the alleged trade dress are, at best, a mere refinement of the commonly adopted and well-known form of ornamentation for crystal singing bowls.

"[T]he question of whether [a] feature is functional should turn on whether the protection of the configuration would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Hark'n Techs., Inc. v. Orange Whip Fitness X, LLC*, No. 1:21-CV-00054-CMR, 2025 WL 1032012, at *7 (D. Utah Apr. 7, 2025) (internal quotation marks omitted). "This inquiry is a holistic one, requiring the factfinder to assess functionality of the trade dress in its entirety rather than considering the individual features of the trade dress in isolation." *Id.* Many of the customers sell bowls infused with similar products. Pyromatics states that the product used often dictates the colors in the bowl and it is not inherently unique. Pyromatics further claims that the infused singing bowls have become so common that a customer could not

37

look at any of these bowls and identify the seller. Pyromatics has refused to sign any exclusivity agreement with Crystal Tones and is, therefore, allowed to manufacture its crystal singing bowls to several customers throughout the industry. The parties will need to explore these issues regarding distinctiveness in design in discovery. Based on the record before the court, the court concludes that Crystal Tones has not demonstrated a likelihood of success on the merits of its trade dress claims.

### D.  Cybersquatting

Crystal Tones brings a claim against Defendants for cybersquatting because of their use of divinebowls.love for their new entity. This claim, therefore, again raises the question as to whether the term "divine" is distinctive in the context of singing bowls and tied to Crystal Tones as the source. "Cybersquatting refers to the 'deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners.'" *One Man Band Corp. v. Smith*, No. 2:14-CV-221 TS, 2014 WL 12622274, at *9 (D. Utah Aug. 19, 2014) (quoting *Utah Lighthouse Ministry*, 527 F.3d at 1057). "To prevail on a cybersquatting claim, a plaintiff must show '(1) that its trademark . . . was distinctive at the time of registration of the domain name, (2) that the domain names registered by the defendant . . . are identical or confusingly similar to the trademark, and (3) that the defendant used or registered the domain names with a bad faith intent to profit." Id. (quoting *Utah Lighthouse Ministry*, 527 F.3d at 1057).

The parties dispute whether the term "divine" in the names of some of Crystal Tones' products gives Crystal Tones the right to preclude the term from use by any other business in the singing bowl industry. Defendants claim and have provided evidence that the term "divine " is widely used in the industry. They also point out that Crystal Tones has never used the complete term "Divine Bowls" in any of its naming conventions or marketing materials. It is also unclear

38

whether Crystal Tones was the first party to use the term divine with respect to singing bowls. Defendants claim that the term is widely used because it is a common way to describe the imbued nature of the bowls. The parties will need to conduct discovery on whether Crystal Tones had a protective interest in divinebowls.love at the time that Defendants registered the domain. There is only speculation that Defendants used the term to garner goodwill from Crystal Tones' reputation. Because underlying factual disputes make Crystal Tones' legal position on this claim unclear, the court finds that Crystal Tones has not met its burden of demonstrating that it is likely to succeed on the merits.

### F.   Breach of Contract Claim Against Benjamin

On August 7, 2021, Benjamin entered into the Ben NDA with Crystal Tones. However, as discussed above with respect to personal jurisdiction, there are many questions as to whether the Ben NDA is valid or enforceable. Until those issues are resolved, Crystal Tones has not met its burden of demonstrating a likelihood of success on the merits of this breach of contract claim.

### G.   Breach of Contract Claim Against Purefect Balance

Crystal Tones argues that it can demonstrate a breach of the LPA against Purefect Balance. However, the court has determined that there is no personal jurisdiction over Purefect Balance in this District. Therefore, to pursue this cause of action against Purefect Balance, Crystal Tones will need to bring the action in a district with personal jurisdiction over it.

Crystal Tones appears to state this claim against Heather and Ben in addition to Purefect Balance. However, the only parties to the LPA are Crystal Tones and Purefect Balance. There is no basis for asserting the claim against the individual owners of the company. Therefore, to the extent that this claim appears to be brought against Ben, the court does not find a likelihood of success on the merits of the claim.

Having reviewed each of Crystal Tones' causes of action, the court concludes that it has not met its burden of demonstrating that it has a likelihood of success on the merits of any of its claims.

### 2. Irreparable Harm

Crystal Tones argues that it will suffer irreparable harm in multiple ways absent an injunction. First, Crystal Tones alleges that it created the specialized infused crystal singing bowls market and its singing bowls are unique and unmatched. Without an injunction, Crystal Tones claims its bowls will lose their uniqueness in the industry because Defendants are using its trade secrets to make similar crystal singing bowls that compete directly with Crystal Tones, and it will lose its distinct competitive advantage in the marketplace.

But Pyromatics counters that Crystal Tones does not know how to manufacture crystal singing bowls utilizing Pyromatics' process and Crystal Tones has never provided any manufacturing processes, design schematics, techniques, methods, procedures, ingredient lists, formulas, chemical compositions, supplier lists, or any other sort of other instructions or information related to the design and manufacture of crystal singing bowls to Pyromatics. Contrary to Crystal Tones' assertions, Pyromatics claims that Crystal Tones is simply one of several businesses that have purchased quartz crucibles from Pyromatics to market and sell to customers as crystal singing bowls, and it was not the first to do so.

Proof of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). As such, some courts consider this element first. The moving party must demonstrate "a significant risk" that it will experience harm for which it cannot be compensated for after the fact by money damages or that money damages would be difficult to calculate. *Id.* The

alleged harm must be "both certain and great, and . . . must not be merely serious or substantial."

*Id.* It must be "of such imminence that there is a clear and present need for equitable relief to

prevent irreparable harm." *Id.* In assessing the significance of the risk, the Court "may consider the

difficulty in calculating damages, the loss of a unique product, and existence of intangible harms

such as loss of goodwill or competitive market position." *Trial Laws. Coll. v. Gerry Spence Trial

Laws. Coll.at Thunderhead Ranch*, 23 F.4th 1262, 1270–71 (10th Cir. 2022) (internal citation

omitted).

Crystal Tones argues that it is entitled to a presumption of irreparable harm on several of its

causes of action. While the court agrees that several of the causes of action could provide for a

presumption if there was a likelihood of success on the merits with respect to those claims, the

court has found too many underlying factual disputes to conclude that Crystal Tones has a

likelihood of success on the merits of any claim. *See, e.g., Tsunami Softgoods, Inc. v. Tsunami

Int'l, Inc.*, No. 2:00CV738K, 2001 WL 670926, at *5 (D. Utah Jan. 19, 2001) ("In trademark

infringement cases, grounds for finding irreparable harm include loss of control of reputation, loss

of trade, and loss of good will."); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1149

(D. Kan. 2007) (party suffers irreparable harm when the unlawful disclosure of its trade secrets

"allows a competitor to cut corners in the research and development process" such that the

"competitor . . . attain[s] a competing product . . . much sooner."); *Juergensen Def. Corp. v.

Carleton Techs., Inc.*, No. 08-CV-959A, 2010 WL 2671339, at *13 (W.D.N.Y. June 21, 2010)

("Money damages would be unable to reverse the competitive advantages that companies

communicating with defendant would gain from skipping the years that plaintiffs spent innovating

the technology in question."); *Instructure, Inc. v. Canvas Techs., Inc.*, No.

2:21CV454-DAK-CMR, 2022 WL 43829, at *14 (D. Utah Jan. 5, 2022) (recognizing the

irreparable harm presumption in the trademark infringement context); *Rylee & Cru, Inc. v. Zhu*, No. 23-CV-00120-PAB, 2023 WL 2187480, at *3 (D. Colo. Feb. 23, 2023) (recognizing the irreparable harm presumption in the cybersquatting context). Therefore, Crystal Tones is not entitled to a presumption of irreparable harm.

Given the many factual disputes between the parties, the court cannot presume the competition in the marketplace will cause Crystal Tones irreparable harm. If it is ultimately determined that the design and manufacturing process for infused crystal singing bowls was Crystal Tones' intellectual property, then Crystal Tones will be able to get monetary damages for loss of sales. There are too many underlying questions of fact at this stage of the litigation for the court to conclude that Crystal Tones' has those intellectual property rights or contract rights. Crystal Tones does not allege that it has currently lost any sales or that there has been any confusion in the market or loss of goodwill. Therefore, the court concludes that Crystal Tones has failed to meet its burden of demonstrating it will suffer irreparable harm absent an injunction.

### 3. Balance of Harms

"In balancing harms, a court looks at whether the moving party's threatened injury outweighs the injury the opposing party will suffer under the injunction." *Core Progression Franchise LLC v. O'Hare*, No. 21-1151, 2022 WL 1741836, at *3 (10th Cir. May 31, 2022) (internal quotation marks omitted). Here, it is unclear which party has the intellectual property rights in question. Given that uncertainty, the balance of harms weighs in favor of Defendants. Defendants would suffer greatly if the court shut down their business.

Because the court finds that Crystal Tones has failed to meet its burden of demonstrating a likelihood of success on the merits or irreparable harm, the court denies the requested preliminary injunction.

**CONCLUSION**

Based on the above reasoning, Plaintiff Crystal Tones' Motion for Preliminary Injunction

is [ECF No. 42] is DENIED, and the California Defendants' Motion to Dismiss [ECF No. 51] for

lack of personal jurisdiction is GRANTED as to Heather D'Amico and Purefect Balance and

DENIED WITHOUT PREJUDICE as to Benjamin D'Amico, pending jurisdictional discovery.

DATED this 9th day of February 2026.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE